**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

STEPHEN W. WIERBONSKI,
        **Plaintiff,**

v.
                              **Civil Action No. 1:04-CV-125**
                                     **(Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant") denying the plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on the parties' cross Motions for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Plaintiff Stephen W. Wierbonski ("Plaintiff") filed his application for DIB on January 30, 2002, alleging disability since August 31, 2001, due to lumbar disc disease, hepatitis C, anxiety, and depression (R. 56-58, 73). The claim was denied at the initial and reconsideration levels of review (R. 36-37). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on March 28, 2003 (R. 462). Plaintiff, who was represented by counsel, appeared and testified on his own behalf, along with Vocational Expert Larry Ostrowski ("VE"). On July 30, 2003, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of decision (R. 26). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner

(R.6).

## II. FACTS

Stephen W. Wierbonski ("Plaintiff") was born on August 8, 1949, and was 53 years old at the time of the Administrative Hearing (R. 56). He has a twelfth grade education, and past relevant work as a coal mine foreman (R. 74). He is presently receiving long term disability benefits through his former employment (R. 123, 129).

On January 3, 2000, Plaintiff presented to his gastroenterologist, Jo Anne O'Keefe, for follow-up of his hepatitis C (R. 289). He reported he had some fatigue but no other symptoms. He was not interested in any treatment at this time.

On February 9, 2000, Plaintiff saw his treating physician Dr. Maurice Rhodes, for follow up of his hepatitis C and back pain (R. 331). He also reported some pain in his right knee and some anxiety. Dr. Rhodes prescribed Darvocet and Valium. The doctor noted there was no evidence Plaintiff had an abuse pattern, so he would be continued on those medications indefinitely.

Plaintiff began receiving outpatient mental health treatment at Chestnut Ridge Hospital on April 7, 2000, after he had two panic attacks in two weeks (R. 240). He had told his supervisor at work he was going to resign, but the supervisor told him to take a week vacation and think it over. He had worked in that mine for two or three years. He had worked in other mines before, but changed to this job to be closer to home. He did not like this job. His other stressors were listed as a new baby (it had been believed his wife was infertile), the wife's difficult pregnancy, his diagnosis two years earlier with hepatitis C caused by past intravenous drug use, his father dying from cancer, and behavioral/relational problems with his 11-year-old Korean-born adopted son.

Upon initial assessment, Plaintiff's mood was depressed and he had decreased pleasure and

2

libido (R. 240). His concentration and memory were good, and he had no suicidal or homicidal ideation. His sleep was interrupted, and he had some decreased energy and increased worrying. He also had decreased interest and motivation and increased anxiety. He had no hallucinations and no paranoia. Plaintiff reported drinking three to six beers four to five times a week along with an occasional shot of vodka. He smoked marijuana occasionally. The last time he smoked marijuana was the previous day. He denied any other current drug use. He had been a heavy cocaine user prior to 1984. In the 60's and 70's he used "most anything." Plaintiff's diagnosis was drug abuse and anxiety, not otherwise specified ("NOS").

One week later, Plaintiff's mood was "down" (R. 239). He had returned to work and it was "ok," but then his father died over the weekend and he had not yet returned to work. He did not drink until after the funeral, then he had three to four beers and three to four shots of vodka. He stated that he really wanted to quit drinking and believed if he was put on medication he could at least make a real effort. He was diagnosed with anxiety NOS and grief reaction. He was prescribed Prozac.

Two weeks later, Plaintiff reported he was "a little better" (R. 238). His anxiety had decreased a little, and his mood was "some better." He felt some relief since his father died, although he also felt some guilt. Work was going "some better," but he still did not like his job. The supervisor he liked was fired the week before and he did not know how this would affect him. He was debating "about trying for disability based on his back pain and the Hepatitis C." He felt he was almost obsessing about work. He had not had any panic attacks but was having anticipatory anxiety about going back to work. His sleep was still not good and his energy was still decreased. He was diagnosed with anxiety, NOS and alcohol abuse, and Zyprexa was added to his medications for

sleep.

On May 25, 2000, Plaintiff reported "doing better" (R. 236). His family had noticed the improvement. His spirits were higher and he actually got excited over the past weekend for the first time in a long time. He continued to reduce his alcohol use. He was not obsessing about work. His mood was better and his sleep was better with the Zyprexa. He had decreased anxiety and irritability, and increased energy, and his libido was back to normal. His affect was broad. He was diagnosed with anxiety NOS and occasional headache in the morning.

On June 22, 2000, Plaintiff again reported "doing ok" (R. 234). His energy was "not as good as he would like but adequate." His spirits had picked up some in the past two weeks, but he noticed some increased ruminating about work again – without the uncomfortable feeling in his chest, however.

On July 3, 2000, Plaintiff presented to Dr. O'Keefe for a follow up of his hepatitis (R. 288). He reported he was "doing fine." He said he had been under a great deal of stress and was evaluated at Chestnut Ridge for that. He was on Prozac and another "antipsychotic drug." He was still not interested in any hepatitis C treatment.

On July 18, 2000, Plaintiff reported to Dr. Rhodes that he continued to have a good bit of back pain and had been seeing a psychiatrist (R. 330). He was prescribed Lortab and Valium as Dr. Rhodes noted he had not had an abuse pattern.

On July 21, 2000, Plaintiff presented to the emergency room ("ER") for increased back pain from a 1989 work- related back injury (R. 132). He told the physician he had two herniated discs, and did not think he could work that day.

On July 28, 2000, Plaintiff told Dr. Rhodes he injured his back and had been unable to walk

for two days (R. 329). He was diagnosed with lumbosacral sprain and was to return to work on July 31.

On August 29, 2000, Plaintiff reported his anxiety was "about the same." He still ruminated some but had improved. He was upset with himself because his alcohol use had increased again almost to the level prior to starting therapy. His mood was good. He had occasional anxiety, but it was less intense. He had no depressive symptoms.

On October 24, 2000, Plaintiff reported not being able to quit alcohol completely (R. 232). He believed part of the problem was his new work shift – he was now off three to four days during the week with no hobbies to occupy his time. He was still not happy with work, and sometimes obsessed about it. He was also at times obsessed about his mortality – would he be around when his young daughter grew up? His mood was good and he had no problems with sleep, appetite, or energy. He had occasional anxiety, but it was not a problem now. His concentration was good, and his affect was broad. Zyprexa was discontinued and his Prozac was increased.

On November 27, 2000, Plaintiff felt "down" and had increased worrying over the past several days (R. 231). Work remained a big stressor. His mood was decreased and anxious. He was sleeping four to five hours. His energy was fair and his appetite ok.

On December 4, 2000, Dr. Rhodes called in a prescription for hydrocodone for Plaintiff's back pain (R. 328).

On December 11, 2000, Plaintiff followed up with Dr. Rhodes for his back pain and hepatitis C (R. 327). He said he was not taking the Valium much on a regular basis. Dr. Rhodes wrote a new prescription for 100 Valium plus a refill, and Lortab.

On December 12, 2000, Plaintiff was feeling "some better," with less ruminating and not as

much "gloom and doom" thinking (R. 230). Things had improved "some" at work. His sleep improved and his mood improved with less anxiety and increased appetite. His affect was broad. He was diagnosed with anxiety NOS-improved and Alcohol Dependency. He had no side effects from medication except weight gain. Plaintiff's counselor recommended inpatient alcohol abuse treatment because of the combination alcohol and drug abuse plus Plaintiff's failed attempts to quit and co-occurring anxiety. Plaintiff refused admission, and said he would attempt abstinence again.

That same day Plaintiff reported to Dr. O'Keefe that he was doing fine with no major complaints (R. 287). He was "getting all of his other problems under control and [] doing reasonably well."

On January 2, 2001, Plaintiff reported things were going fairly smoothly at home and work but he had not been able to decrease his alcohol use (R. 226). He had not been to any AA meetings. His mood was improved some and his anxiety was "fairly stable." He slept using the Zyprexa. His appetite decreased some. He had not felt the need for his Neurontin for anxiety.

On January 18, 2001, Plaintiff presented to Orthopedic surgeon John R. France, M.D. for his longstanding history of low back pain with radiation into his right leg (R. 144). He had suffered a back injury at work in 1989 when he stepped into a deep hole with an uneven surface. A CT scan at the time of the injury showed evidence of a small disc herniation at the L5-S1 level. His clinical findings did not correlate with the CT scan, however, so the pain was felt to be largely mechanical. He was treated conservatively but failed to improve. He was finally referred to the Pain Clinic where he underwent epidural steroid injections in 1991, which failed to improve his symptoms. Since that time he had been addressing the pain simply with activity modification and an occasional Lortab.

Upon examination, Plaintiff had mild tenderness to palpation of the lumbar spine. Spine flexibility was essentially normal. He could bend forward and touch his toes. His gait was normal. Upper and lower extremities all had full active and passive range of motion throughout. He had full strength in the lower extremities. He did have some difficulty with single toe raises on the right as compared to the left.

X-rays of the lumbar spine showed diffuse degenerative changes particularly at L5-S1, with no evidence of gross instability or bony malalignment. Dr. France opined the exact nature of Plaintiff's complaint was "unclear," and Plaintiff's symptoms did not seem to match the radiographic findings. He referred Plaintiff for an MRI.

On January 30, 2001, Plaintiff's anxiety was reported to be stable. His work was less stressful. His mood was fairly good and anxiety was under control. His sleep was not as sound on a new medication as it had been on Zyprexa. His affect was broad and his diagnosis was anxiety NOS–under control, and alcohol dependence. He was switched back to Zyprexa for sleep.

An MRI in early March 2001, showed multiple level degenerative disc disease with some minimal canal stenosis but no significant neural impingement (R. 142). Dr. France discussed back surgery with Plaintiff, but discouraged it. He encouraged "a general back exercise program of fitness." Plaintiff asked Dr. France about the possibility of disability for back pain, and Dr. France noted that "obviously, this is something that is based on subjective levels of the pain," and explained that was a personal decision Plaintiff would have to make.

On March 16, 2001, Plaintiff reported he had "decided to try for disability for his back pain," stating "I just can't work anymore" (R. 223). His mood was "down."

On March 21, 2001, Plaintiff told Dr. Rhodes he had been off work for his back (R. 326).

He had been thinking about getting disability but his back was now feeling better. He was to return to work the next day. He was given another prescription for Lortab and Valium and a back to work slip.

On March 27, 2001, Plaintiff told his therapist he felt "some better" than on his last visit (R. 222). He admitted using increased alcohol prior to that last visit and believed that was why he was down and ready to try for disability. He had since returned to work.

On May 2, 2001, Plaintiff was "doing fairly well" (R. 221). He had enjoyed a trip to New York to visit his adult daughter. He still had occasional anxiety, but it was more manageable. His mood was usually good, and his sleep was good. His energy was fair and his appetite was good. There was no change in his alcohol consumption.

On May 24, 2001, Plaintiff had "no problems [with] anxiety recently" (R. 220).

One month later, Plaintiff reported he was "ok" (R. 219). He had had a couple of bad days with anxiety the past week and "just didn't want to go to work." Otherwise, he was doing fairly well. There was little change in his alcohol consumption, however. His affect was broad.

On June 11, 2001, Plaintiff told Dr. O'Keefe he was doing fine and having no problems (R. 287). He was seeing a counselor at Chestnut Ridge and was doing well with that. Dr. O'Keefe noted: "Really nothing else is bothering him. He is feeling good. He is not having any symptoms of any sort."

On July 18, 2001, Plaintiff told Dr. Rhodes he continued to have pain in his back (R. 325). He was prescribed Vicoprofen.

On July 25, 2001 Plaintiff told his therapist was feeling "some better" since a vacation (R. 218). His mood was good and he had less anxiety recently. Hie was diagnosed with anxiety NOS

8

Improved.

Plaintiff stopped working on August 31, 2001 (R. 73). This is also his alleged onset date.

On September 5, 2001, Plaintiff told his therapist he was "ready to come in for treatment" (R. 217). He was unable to stay away from alcohol. He had had four beers with two vodkas and pain pills the previous Thursday, and that evening could not even remember if he had showered that day. He woke the next morning with anxiety as bad as when he had first started therapy. He was unable to work. He spoke with his supervisors and admitted his alcohol abuse and told them he was going to get treatment and would be off work. He drank four to five beers with vodka and pain pills the day before the appointment. Recently he deliberately did not eat so he could get more of a buzz. He had gone without alcohol for four days earlier in the month when he was chaperoning Band Camp. He was diagnosed with Alcohol Dependency.

Plaintiff was admitted as an inpatient at Chestnut Ridge Psychiatric Hospital for drug abuse and alcoholism and panic and anxiety attacks on September 5, 2001 (R. 73). His only prior psychiatric treatment was for rehabilitation admittance for two weeks in the 1980's for cocaine abuse. He said he was motivated to come for treatment because he had recently had a series of anxiety attacks which made it very difficult for him to work. He was also very concerned about his recent diagnosis with hepatitis C. Upon admission he described his mood as slightly depressed. He also described a little nervousness and anxiousness. His affect was appropriate. His immediate, recent and remote memory was intact, and his concentration was "overall good." Intelligence was appropriate, judgment was good and insight was good.

Plaintiff was "detoxed" and attended group and individual therapy as well as Narcotics Anonymous and Alcoholics Anonymous meetings. Neuropsychological testing showed a mild

9

decrease in attention and memory retrieval. Plaintiff reported a lot of concerns regarding the death of his father two years earlier. He was afraid he would die in the mines and not see his three-year-old daughter grow up.

Plaintiff's mood improved steadily over the course of his hospitalization. Plaintiff was discharged 12 days later, with a diagnosis of Alcohol Dependence, history of cocaine dependence, and history of major depression (R. 155). His Beck Depression Inventory had improved from 13 on admission to 8 on discharge and his anxiety inventory improved from 18 on admission to 7 on discharge. His only stressor was listed as "employment-related stress." His Global Assessment of Functioning was 60.[1] He was discharged in stable condition with no suicidal or homicidal ideations. He was to follow up in the intensive outpatient program, and was given a release from work until November 11, 2001.

On September 13, 2001, Plaintiff presented for a neuropsychological evaluation in reference to his history of alcohol and drug abuse (R. 215). The doctor concluded that Plaintiff was showing mild changes with his cognitive functioning, particularly related to attention and visual memory retrieval. He also had deficits with verbal memory when organization was required. The neuropsychologist opined these deficits were likely a product of Plaintiff's alcohol and drug abuse, anxiety and depression, and possibly his hepatitis C. He opined:

> With abstinence and improvement in his mood, he is likely to show some recovery of his cognitive functioning. Regardless of whether or not he shows recovery, particularly since his memory or organized verbal material is good and he has good problem-solving, his deficits would likely be of limited functional significance . . ..

---

[1]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On October 5, 2001, Plaintiff reported to his therapist that he was dreading going back to work in November, when his temporary disability would end (R. 212). He claimed he hated his job and had never been to it sober. Part of him wanted to file for disability due to chronic pain and other health problems. He was "getting scared" because the days were running out for him to make a decision.

On October 17, 2001, Plaintiff told his therapist he was coming closer to making a decision about whether or not to return to work (R. 204). He was leaning toward not returning to work and was making a list of pros and cons about the decision. The pros about not returning to work included less back pain, less stress, more time with his kids, and more time to relax. The con he was most concerned about was that he would need to sell his house for financial reasons.

On November 5, 2001, Plaintiff presented to Dr. Rhodes stating he was being treated for severe depression and was having trouble motivating and difficulty sleeping (R. 324). Dr. Rhodes diagnosed severe depression.

Plaintiff had originally been scheduled to return to work on November 11, 2001. On December 11, 2001, Plaintiff told Dr. Rhodes he was having increasing back pain radiating down his right great toe (R. 323). He was "on a vigorous walking program." His disability was extended to January 15, 2002.

On December 31, 2001, Plaintiff presented to C. Andrew Heiskell, M.D. for a lump on his neck (R. 311). At the time his only medications were Serzone and Ibuprofen. He denied alcohol use. He denied any gastrointestinal problems. Upon physical examination, Plaintiff had normal gait and station and full range of motion. He did have a large mass on his neck. He was fully oriented and displayed an appropriate affect. Plaintiff underwent excision of the mass.

On January 18, 2002, Plaintiff presented to Dr. Rhodes complaining of a good bit of pain in the lumbar area (R. 322). He said he was getting physical therapy. He had positive leg raises. He was to continue physical therapy. Dr. Rhodes completed forms for Plaintiff's workers' compensation claim. The forms indicated that Plaintiff had lumbar disc disease and hepatitis C, and complained of fatigue and lumbar pain. The only objective finding was spasm in the lumbar area. Dr. Rhodes opined Plaintiff could sit only one hour and walk for only one hour with rests. He could lift 10 to 25 pounds. He could never climb and could occasionally bend, stoop, squat, and reach above the shoulder level. There were no cognitive deficits.

On January 19, 2002, Plaintiff told Dr. O'Keefe he was doing fine with no problems (R. 286). He was no longer drinking and not taking any medications. He was "doing great." He said he was having some depression and "some other things" but nothing that was bothering him "too awful much." He was trying to make some decisions about his life, but was stable.

Plaintiff was diagnosed with a multinodular goiter in February 2002 (R. 316).

On February 19, 2002, Plaintiff told Dr. O'Keefe that he was "doing alright" (R. 285). He was considering treatment for his hepatitis. The gastroenterologist was concerned because of "his severe depression which seems to only be getting worse."

Plaintiff's social worker and psychiatrist wrote in February 2002, that after his inpatient treatment for drugs and alcohol, Plaintiff's anxiety symptoms changed somewhat into feelings of excessive worry and dread (R. 176). He also showed signs of depression: trouble getting out of bed, tearfulness, decreased motivation, and passive suicidal ideation. He sometimes had trouble leaving the house and getting out of bed. He also continued to ruminate and worry about his life, and especially death, although this was better than it was initially.

Plaintiff began short term Adult Children of Alcoholics ("ACoA") group therapy on February 28, 2002 (R. 453). His mood was dysthymic and his affect restricted. His diagnosis was alcohol dependence in early full remission.

State agency psychologist Frank Roman, Ed.D. completed a Psychiatric Review Technique ("PRT") on March 5, 2002, based on an affective disorder – depression, recurrent (R. 248-261). He did not note a substance abuse disorder or anxiety disorder. He found Plaintiff's degree of limitation of activities of daily living was mild, maintaining social functioning was moderate, concentration persistence and pace was mild, and there were no episodes of decompensation.

Dr. Roman also completed a Mental Residual Functional Capacity Assessment ("MRFC"), opining Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He was otherwise not significantly limited in any area. Dr. Roman also opined that Plaintiff could perform routine activities of daily living and resume work in a low-stress setting (R. 264).

On March 27, 2002, Plaintiff was examined by Kip Beard, M.D., for the State Disability Determination Division (R. 266). At this time Plaintiff's largest complaint was fatigue. He also mentioned intermittent joint aches "like the flu," lasting a few days at a time. He was not taking any medication for hepatitis. He also had lower back pain which he treated with heat and ice and Tylenol #3. He was also taking Serzone. He reported his illnesses/hospitalizations only as for anxiety and depression. Under "Alcohol" the report states only that Plaintiff quit drinking alcohol seven months

13

earlier (R. 267).

Upon examination, Plaintiff's gait was slow and stiff-postured, but without a limp (R. 268). He used no assistive device. He could stand without assistance. He had trouble rising from a seated position and getting on and off the table because of pain. He appeared uncomfortable seated and supine. The cervical spine appeared normal. There was pain and tenderness in both shoulders, but no redness, warmth or appreciable crepitation. Flexion was normal but abduction was diminished. Elbows and wrists were normal. There was swelling at the left second PIP joint of the hand, related to a prior injury. There was full range of motion in all other fingers. He could make a fist. Knees were normal. Ankles and feet were normal.

There was dorsal kyphosis of the dorsolumbar spine and right paravertebral tenderness without spasm. There was pain with range of motion testing. There was no tenderness of the lumbar spine with percussion. Plaintiff could stand on one leg at a time without difficulty. Seated straight leg raises were negative with reports of lower back pain, but supine straight leg raises were positive at 50 degrees on the right and 60 degrees on the left with back pain. There was pain with range of motion testing in the right hip and pain with internal rotation.

There was no evidence of neurological weakness. There was a positive right Tinel's sign. Sensation was intact. Reflexes were normal except for an absent right Achilles deep tendon reflex. Plaintiff could walk on his heels and toes, walk heel-to-toe, and squat with difficulty due mainly to back pain.

Dr. Beard's diagnosis was Hepatitis C with reports of active infection on recent testing with recommendation for treatment and chronic fatigue; chronic back pain due to chronic lumbosacral strain likely superimposed upon degenerative disc and joint disease; and possible mild osteoarthritis involving the shoulder and maybe the hips (R. 271). In summary, Dr. Beard found Plaintiff had

14

chronic back pain associated with diminished motion. He opined there may have been some evidence of nerve root irritation. There were no focal or sensory motor discrepancies suggesting a definite radiculopathy, although Plaintiff did have an absent Achilles reflex.

At Plaintiff's tenth ACoA group therapy session on March 28, 2002, his affect was broad and his mood euthymic (R. 452).

At Plaintiff's 11th ACoA group therapy session on April 4, 2002, his mood was dysthymic and his affect appropriate (R. 452).

At his last ACoA group meeting on April 11, 2002, Plaintiff's mood was congruent and his affect appropriate (R. 451).

On April 12, 2002, State agency reviewing physician Thomas Lauderman completed a physical RFC based on hepatitis C and back pain (R. 275). He found Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit about six hours in an eight-hour workday. He could perform all posturals frequently, except for climbing only occasionally due to back pain. He should avoid concentrated exposure to extreme cold and hazards. Dr. Lauderman noted Plaintiff was non-compliant with medical treatment for his hepatitis. He opined Plaintiff's range of motion was slightly decreased, and decreased his Residual Functional Capacity ("RFC") due to pain and fatigue.

On May 9, 2002, Plaintiff was scheduled to go for evaluation for possible treatment of his hepatitis. He was debating whether he wanted to go. He said he was doing a little better since he has gotten some of his disability, although he was still concerned that he had not gotten all of it. He was in the process of appealing this. Otherwise he was doing well.

On June 10, 2002, Dr. Brian Berk evaluated Plaintiff for possible hepatitis treatment (R. 347). Dr. O'Keefe was uncomfortable treating him because of his history of depression. Dr. Berk,

however, noted that Plaintiff denied any significant issues other than being mildly depressed. He said he felt relatively well. His only medication was Serzone. Plaintiff told Dr. Berk he quit work because of his back problem. He said his last drink was in August 2001. He was noted to be negative for fatigue, headaches, gastrointestinal problems, arthralgias, and myalgias. He was negative for anxiety but positive for depression. Plaintiff also had mild psoriasis over the left knee and umbilicus area.

Dr. Berk diagnosed mild liver disease, and therefore believed there was a 63-94% likelihood of cure. The therapy, however, would be "somewhat symptomatic and would likely have exacerbation of his psoriasis and depression." Dr. Berk therefore recommended Plaintiff be followed by a psychiatrist during his therapy.

On July 9, 2002, Plaintiff presented to a dermatologist for his history of psoriasis he had "as long as he can remember" (R. 319).

On August 8, 2002, endocrinologist R. Harsah Rao, M.D., indicated that Plaintiff's goiter was asymptomatic with the exception of "some symptoms of anxiety, palpitations, and fatigability which are probably more attributable to his history of depression and anxiety than to hyperthyroidism" (R. 339). He was "on no medications other than Serzone for his depression and this medication has made a great difference to his overall mental state." The doctor noted Plaintiff's past medical history was significant "only for a chronic back condition that has resulted in his application for long-term disability." He also had a history of hypertension but was not receiving any treatment and his pressure was under control without any medication.

Upon examination, Plaintiff had a normal mood and affect, vital signs were stable, reflexes were brisk, skin temperature and texture were normal, there was no tremor, and his palms were cold and dry. Dr. Rao opined Plaintiff had a solitary nodule on the thyroid. He recommended a biopsy.

On August 13, 2002, Plaintiff had an MRI of the left shoulder for his three-month history of pain without injury (R. 333). It indicated probable partial thickness tear of the supraspinatus and infraspinatus tendons and type 2 acromion with some sclerosis of the inferior aspect acromion.

A needle biopsy on September 3, 2002, indicated Plaintiff's thyroid nodule was benign (R. 352).

Plaintiff saw orthopedic surgeon David Lynch, M.D. on September 12, 2002, for his low back pain (R. 402). At the time Plaintiff's only medication was Serzone. He said he was "out of Ibuprofen." Upon examination his gait was normal, hip range of motion was normal, and he had negative straight leg raises both sitting and supine. Dr. Lynch's diagnosis was chronic low back pain. He recommended follow-up x-rays.

On October 4, 2002, State agency reviewing physician Cynthia Osborne completed an RFC based on Plaintiff's Hepatitis C and chronic back pain syndrome (R. 376). She opined he could work at the medium exertional level and stand/walk six hours in an eight hour workday and sit six hours in an eight-hour workday. He had no other limitations.

On October 15, 2002, State agency reviewing psychologist Samuel Goots, Ph.D. completed a PRT based on depression (R. 388). He opined Plaintiff would have only mild limitations in daily activities, social functioning, and concentration, persistence or pace (R. 395).

Plaintiff began pegylated interferon and ribavirin therapy for his hepatitis C in October 2002 (R. 420). During his third week of treatment, on November 12, 2002, he reported difficulties with bone aching, arthralgias, and malaise. He stated he had a history of chronic low back pain but took Vicoprofen "with complete symptomatic response." The Vicoprofen had been discontinued due to the interferon therapy. He currently had no vomiting, nausea, depression, anhedonia, or sleep disturbance. Dr. Berk prescribed Vicodin for the pain and Neupogen for neutropenia secondary to

17

interferon therapy.

On November 20, 2002, Plaintiff told his therapist he had "a really short fuse now" (R. 449). He said he was "dealing with" his private disability insurance, worker's compensation, Social Security, and refinancing his house. He was fighting with his adopted 14-year-old Korean-born son who aggravated his 4 year old sister. He just felt like there was "A lot going on." He was more stressed. He wanted to resume therapy again.

On December 6, 2002, Dr. Rhodes wrote that Plaintiff's back pain had become incapacitating on August 31, 2001 (R. 412). He currently had chronic low back pain unrelieved. He reported that numerous physical therapies had been attempted, but not massage therapy, and therefore requested workers' compensation consideration of massage therapy.

On December 10, 2002, Plaintiff told his therapist he was "a bit less harried" that week (R. 447). He did describe stress in taking three dogs and his four year old to the veterinarian the day before. He was diagnosed with major depressive disorder.

On December 11, 2002, during his eighth week of interferon therapy, Plaintiff reported difficulty with headache, weakness, occasional dizziness upon exertion, fatigue, and low back pain (R. 418). He reported the Vicodin helped significantly. He denied any other difficulties or complaints including depression, anhedonia or sleep disturbance. His neutropenia was well controlled. He was prescribed Vicodin and was to see an orthopedic surgeon. He was prescribed Procrit for anemia for his fatigue.

Plaintiff followed up with orthopedist Lynch on December 12, 2002 for his back pain (R. 401). He reported to Dr. Lynch that he stopped working on August 31, 2001 "because he couldn't tolerate the pain anymore." Upon examination, straight leg raises were negative, strength was intact, and reflexes were symmetrical. The impression was chronic low back pain with reported increased

18

symptoms. Dr. Lynch requested an MRI, EMG, and nerve conduction studies.

On December 17, 2002, Plaintiff told his therapist he felt fatigued due to the interferon treatment (R. 446). He seemed to be doing better with his son recently.

On December 31, 2002, Plaintiff told his therapist he felt "ok" (R. 445). He said he was depressed before Christmas but now felt better. He seemed to tolerate his medications but did notice tiredness. He had a 20-30 minute panic spell while showing a rifle to his brothers-in-law the day before. He had not shot it in five years, but was afraid/concerned about what happened.

On January 8, 2003, Plaintiff told his therapist he continued to struggle with irritability and emotional swings (R. 444). His therapist encouraged him to attend more AA meetings.

On January 10, 2003, Plaintiff was on his 12th week of interferon therapy (R. 416). He reported he was now tolerating the therapy quite well. He had had one episode of nausea without vomiting, but otherwise felt quite well. He denied any other significant difficulties or complaints. The Procrit reportedly had his anemia well controlled.

Plaintiff underwent a Functional Capacity Evaluation ("FCE") on January 14, 2003 (R. 423). Plaintiff ambulated with a normal movement pattern and no antalgia was noted (R. 424). There was no warmth, swelling or skin discoloration. There was tenderness to palpation throughout the right lumbosacral soft tissue and right ischial tuberosity. He had a slightly accentuated lumbar lordotic curve with no lateral shift. Heel-toe standing was normal. There was minimal movement loss for lumbar flexion and extension, but increased lumbosacral pain was noted at end ranges of motion. He had mildly decreased flexibility throughout the hip and lower extremities. He had positive straight leg raising on the right and negative on the left.

The evaluator opined that Plaintiff performed at the medium exertional level, but "at the lower level of this classification and with elevated complaints of pain and discomfort." The

19

evaluator therefore "question[ed] his ability to perform medium level activity consistently." He believed light level would be more appropriate with accommodations (R. 422). He opined Plaintiff could function independently in the competitive labor market with accommodations including no repetitive bending, climbing, crouching, stooping or kneeling; sitting for 20-30 minutes at a time with periodic adjustments for postural change; standing for 20-30 minutes at a time with periodic adjustments for postural change; and walking for about 20 minutes at a time (R. 426).

On January 15, 2003, Plaintiff described to his therapist the numerous medical and legal appointments he had that week (R. 443). He was excited that his oldest son had received an invitation to audition for a band in New York.

Plaintiff underwent motor nerve study, sensory nerve study and an EMG for his low back pain on January 17, 2003 (R. 404). The results were unremarkable with no signs of an acute radiculopathy (R. 405).

On January 22, 2003, Plaintiff reported to his therapist that he had received refinancing on his home which would reduce his monthly payments. He also discussed with his therapist his excitement over his son's leaving for New York to audition for a band (R. 442).

On January 23, 2003, orthopedist Lynch followed up with Plaintiff regarding his MRI, EMG, and nerve conduction studies (R. 401). He reported the MRI showed "some degenerative disk changes and disk protrusion L5-S1 to the left." Most of his symptoms were in the low back and right leg. He reported doing fairly well on his hepatitis C treatment. The impression was chronic back pain with no signs of any acute surgical lesions either on MRI or EMG. Nerve Conduction Studies showed no acute radiculopathy. Dr. Lynch felt Plaintiff had "mechanical low back pain and would recommend four to six weeks of physical therapy including myofascial release stretching [and] abdominal and low back strengthening."

At Plaintiff's next therapy session, he reported feeling anxiety over events that occurred during the week (R. 441). This was mostly over his oldest child and his desire for his "wife to agree to a compatible parenting style." He therefore requested his wife be included in his next session. They also discussed Plaintiff's "belief that he can never work again."

Plaintiff attended his next therapy session with his wife, as he had requested (R. 440). The discussion centered around their 14 year old Korean-born adopted son, and Plaintiff's wife's need to be needed. They also discussed the need for his wife to set limits regarding the son.

On February 3, 2003, Plaintiff was in his 17th week of interferon therapy (R. 413). He was having recent difficulties with psychosocial stressors including being recently informed his adult daughter was a Heroin addict. He felt some guilt over this. He reported that he was not significantly tearful or excessively depressed. The Serzone was working okay. He was otherwise having "some difficulties with fatigue but otherwise feels 'okay." He denied any other significant difficulties or complaints. He was no longer on Procrit, and the doctor was reconsidering this due to his reported fatigue. He opined Plaintiff's depression was "currently asymptomatic."

An MRI of the lumbar spine on February 4, 2003, indicated degenerative disc disease at L3-4, L4-5, and L5-S1 with disc bulge at L3-4 and L4-5; left disc protrusion at L5-S1; and degenerative facet changes in the lower lumbar area (R. 406).

On February 10, 2003, Plaintiff reported to his therapist that he was upset because he found out his daughter who lived in New York was addicted to Heroin (R. 439). They discussed treatment options for the daughter. They also discussed issues between Plaintiff and his wife regarding their son.

On February 25, 2003, Plaintiff reported to his counselor his frustrations related to his wife and adopted son (R. 438). He sometimes felt he would leave the situation if he were not dealing with

21

his illness and workers' compensation issues at the time. They also discussed his daughter who was currently in Florida with her mother. She was not using Heroin currently and was talking with a therapist from Morgantown by phone.

In March 2003, Plaintiff reported to his psychiatrist that he had "a lot of shit" going on (R. 437). His 29 year-old daughter was using intravenous Heroin. He was also unhappy about his 27-year-old son's credit card debt and lack of ambition. His mood was frustrated and irritated.

Later that same month Plaintiff reported to his counselor/social worker that his daughter was to return to New York soon and he was worried about this (R. 436). He also reported continued stress regarding the issue with his wife and their adopted son. He continued to report reactions to his hepatitis treatment, including fatigue, poor concentration, and other symptoms of depression.

Plaintiff's social worker/counselor wrote a letter regarding his course of treatment (R. 435). He noted Plaintiff's admission and inpatient treatment through September 17, 2001 for alcohol dependence; his subsequent Addiction Intensive Outpatient Program therapy from that date until November 29, 2001, where his diagnosis was alcohol dependence and chronic pain syndrome; his 12-session group therapy beginning January 24, 2002, which focused on relational issues impacting his life, where his diagnosis was Major Depressive Disorder – recurrent, chronic pain syndrome, and alcohol dependence in remission; and his individual therapy sessions beginning December 2, 2002. The social worker opined that Plaintiff continued his struggle with chronic pain, making it impossible for him to return to his work in the coal mines. He also noted Plaintiff suffered from Major Depressive Disorder – recurrent, impacting his ability to concentrate and lowering his frustration tolerance. He also noted Plaintiff's current hepatitis therapy which he said left him very fatigued and often aggravated his depression. He then opined that these factors clearly limited Plaintiff's ability to return to work.

The administrative hearing was held on March 28, 2003 (R. 462). At the hearing Plaintiff testified that his main problem was back and leg pain and muscle and joint pain (R. 470). He testified he stopped work on August 31, 2001 because he "just couldn't do it anymore with the, the back problem and the other problems." He testified he could stand for 30-45 minutes without moving around (R. 472). He could stand for three hours if he could move around and adjust. He could sit about three hours before he'd have to get up and move around. He said he dropped things for the past two years. The Vicodin helped his pain, although it did cause him side effects of depression. His orthopedic specialist did not restrict him in any way, and said he should walk.

Plaintiff also testified he had quite a bit of fatigue from his hepatitis C therapy, plus headaches and flu-like symptoms. Two or three days a week he had fever, shakes, and chills. He also had sore joints and very low pain tolerance, and his frustration and anger level increased.

Plaintiff also testified he started having urinary frequency (R. 486). His psoriasis was also worse since he started treatment for hepatitis. He said it would affect him in terms of working because of the itching/aggravation.

Shortly after the administrative hearing Dr. Berk submitted a letter at the ALJ's request stating:

> [Mr. Wierbonski] is currently on week number 24 of a 48-week course of treatment with Peg Intron and Ribavirin. This treatment is anticipated to be completed September of 2003.
>
> We frequently find that many patients have significant side effects from the medication, thus requiring them to be on temporary disability for their treatment duration. Due to medication side effects of anemia, fatigue, depression, neutropenia, malaise, and decreased mental clarity that Mr. Wierbonski is now experiencing, he is unable to work through the duration of his treatment.

(R. 454).

23

## EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

After the ALJ's decision, Dr. Berk wrote another letter in response to that decision, that was submitted to the Appeals Council. Plaintiff was on week 47 of the 48-week treatment at the time (R. 461). He was still expected to be finished with this treatment in September 2003. Dr. Berk wrote:

> Although this treatment will be completed in September, it is known and thoroughly documented that some side effects of treatment may linger past the date of completion due to these medications [sic] long half life. Peg Interferon and Rebetol have been found in trace amounts for up to six months after the completion of treatment.

> We frequently find that many patients have significant side effects from the medication, thus requiring them to be on temporary disability for their treatment duration and case dependent, sometimes longer. Due to medication side effects of anemia, fatigue, depression, neutropenia, malaise, and decreased mental clarity that Mr. Wierbonski is now experiencing, he is unable to work throughout the duration of his treatment.

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations. 20 CFR § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

24

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §404.1527).

7.  The claimant has the following residual functional capacity: He can sit for six hours in an eight-hour day and stand and walk six hours in an eight-hour day with the ability to briefly (one to two minutes) change positions at least every half hour. He cannot perform any overhead reaching or tasks involving exposure to concentrated levels of heat or cold, workplace hazards, ladders, ropes, or scaffolds. He can only occasionally perform tasks involving stairs, ramps, balancing, stooping, kneeling or crawling. The claimant cannot perform tasks requiring close concentration or attention to detail for extended periods, work in close coordination with or in close proximity to more than six co-workers or supervisors who would generally remain the same, cannot tolerate close supervision and must be able to miss up to two days of work per month.

8.  The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.  The claimant is 53 years old or an individual closely approaching advanced age (20 CFR § 404.1563).

10. The claimant has a high school education (20 CFR § 404.1564).

11. The claimant has no transferable skills from any past relevant work according to the testimony of a vocational expert (20 CFR 1 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

13. Although the claimant's exertional and nonexertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples include light jobs as an assembler (271 regionally and 495,000 hundred [sic] nationally), a mail clerk (39 regionally and 51,300 nationally), a library clerk (32 regionally and 33,200 nationally), and a hand packer (139 regionally and 215,300 national [sic]).

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(R. 25-26).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The Commissioner arbitrarily and improperly rejected new and material evidence;

2. It was reversible error for the ALJ to use his own medical judgment to determine that the plaintiff could stand for six hours if he was permitted to change

26

positions every half hour;

     3. The ALJ failed to properly apply the Social Security Regulations to analyze the Plaintiff's pain caused by bulging and degenerative lumbar discs and the plaintiff's fatigue and lethargy caused by hepatitis C.

     4. It is reversible error for an ALJ to ignore favorable evidence.

Defendant contends:

     1. Dr. Berk's September 11, 2003 correspondence submitted for the first time to the Appeals Council does not warrant a remand;

     2. The ALJ properly determined that Plaintiff had the residual functional capacity to perform light work based upon the evidence of record; and

     3. The ALJ properly determined that Plaintiff's pain complaints were not entirely credible.

### C. Evidence Submitted to the Appeals Council

Plaintiff first argues the Commissioner arbitrarily and improperly rejected new and material evidence. Defendant contends Dr. Berk's September 11, 2003 correspondence submitted for the first time to the Appeals Council does not warrant a remand. In *Wilkins v. Secretary*, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new
> evidence would have changed the outcome.

*Id.* at 96. Defendant's reliance on *Borders v. Heckler*, 777 F.2d 954 (4th Cir. 1985), is misplaced. *Borders* concerns only new evidence submitted for the first time to the Court. Thus, the need for a claimant to show good cause for his failure to submit the evidence when the claim was before the Commissioner, and make at least a general showing of the nature of the newly-discovered evidence.

27

There are no such requirements where new evidence has been submitted to the Appeals Council.

Still, the undersigned finds Plaintiff's argument in this regard unpersuasive.

At the hearing, Plaintiff testified that Dr. Berk took patients off work during their interferon treatment. The ALJ requested a statement from Dr. Berk regarding this, since there was absolutely no evidence in the record that Plaintiff was restricted or limited in any way due to his hepatitis C or its treatment. Dr. Berk submitted a letter in March 2003, stating, in pertinent part:

> [Mr. Wierbonski] is currently on week number 24 of a 48-week course of treatment with Peg Intron and Ribavirin. This treatment is anticipated to be completed September of 2003.
>
> We frequently find that many patients have significant side effects from the medication, thus requiring them to be on temporary disability for their treatment duration. Due to medication side effects of anemia, fatigue, depression, neutropenia, malaise, and decreased mental clarity that Mr. Wierbonski is now experiencing, he is unable to work through the duration of his treatment.

(R. 454). Based in part on this letter, the ALJ determined that, while Plaintiff had some medication side effects from his interferon therapy, "the side effects, even if they were enough to 'tip the scales,' would not last one full year, the minimum requirement to show disability" (R. 22).

After the ALJ's decision, Plaintiff submitted to the Appeals Council a second letter from Dr. Berk, stating, in pertinent part:

> [Mr. Wierbonski] is currently on week number 47 of a 48-week course of treatment with Peg Intron and Ribavirin. This treatment is anticipated to be completed September of 2003. Although this treatment will be completed in September, it is known and thoroughly documented that some side effects of treatment may linger past the date of completion due to these medications long half life. Peg Intron and Rebetol have been found in trace amounts for up to six months after the completion of treatment.
>
> We frequently find that many patients have significant side effects from the mediation, thus requiring them to be on temporary disability for their treatment duration and case dependent, sometimes longer. Due to medication side effects of anemia, fatigue, depression, neutropenia, malaise, and decreased mental clarity that Mr. Wierbonski is now experiencing, he is unable to work throughout the duration

of his treatment.

(R. 461). This evidence clearly relates to the period at issue. The undersigned also finds the evidence "new," albeit just barely. The letter before the ALJ and the one submitted to the Appeals Council are identical with the exception of the sentences regarding how "some" side effects "may" linger past the date of completion of treatment, and that, "case dependent," patients may require temporary disability for longer than the treatment duration.

Even if this evidence is "new," however, the undersigned does not find it is "material"– that is, that there is a reasonable possibility it would have changed the ALJ's decision. The ALJ fully discussed Dr. Berk's earlier letter as follows:

> Treating physician Dr. Berk's recent assessment in Exhibit 26F is a general description of possible side effects from Interferon therapy and while he suggests that the claimant is unable to work during the course of this treatment, actual treatment notes made during the course of this therapy have not consistently noted side effects of a disabling nature. In fact, the claimant has on occasion described himself as doing well during this treatment, with side effects mainly occurring with exertion. Given those treatment notes and the claimant's admitted daily activities despite this treatment, limited weight has the [sic] given to this assessment.

(R. 22). The record shows Plaintiff did complain of headache, weakness, occasional dizziness upon exertion, and fatigue during his eighth week of interferon therapy. He denied any other difficulties, however, including depression, anhedonia or sleep disturbance. His neutropenia was well-controlled. He was prescribed Procrit for anemia for his fatigue. One month later, during his 12th week of therapy, Plaintiff stated he felt "quite well," and denied any significant difficulties or complaints with the exception of one episode of nausea without vomiting. It was particularly noted that the Procrit had Plaintiff's anemia "well controlled." During his 17th week of therapy, Plaintiff reported "some difficulties with fatigue but otherwise feels 'okay'." He denied any other complaints. Notably, he was no longer on the Procrit which had controlled the anemia, and his doctor was reconsidering this. His depression was "asymptomatic." This despite the fact he had recently

learned his daughter was an intravenous Heroin addict. Dr. Berk's statements about "general" symptoms are therefore inconsistent with Plaintiff's own personal symptoms as described in the doctor's notes only six weeks earlier. The undersigned therefore finds the ALJ properly accorded only limited weight to Dr. Berk's letter.

Notably, despite giving limited weight to Dr. Berk's assessment, and despite finding Plaintiff's complaints of pain and fatigue not entirely credible, the ALJ's RFC still reflected Plaintiff's complaints of fatigue, pain, and depression, limiting him to tasks requiring no close concentration or attention to detail for extended periods, no work in close coordination with or in close proximity to more than six co-workers or supervisors, who would generally remain the same, no close supervision, and the ability to miss work up to two days per month.

The undersigned finds substantial evidence supports the ALJ's according only limited weight to Dr. Berk's March 2003 letter. The September 2003 letter is identical, only adding that the same side effects, if any, "may," "sometimes," "case dependent," last longer than 48 weeks. The undersigned finds there is not "a reasonable possibility that the new evidence would have changed the outcome" of the case. *Wilkins*, 953 at 93. The evidence is therefor not "material."

Because the new evidence is not "material," the undersigned finds substantial evidence supports the Appeals Council's determination that the evidence did not provide a basis for changing the ALJ's decision.

### D. RFC

Plaintiff next argues it was reversible error for the ALJ to use his own medical judgment to determine that Plaintiff could stand for six hours if he were permitted to change positions every half hour. Defendant contends the ALJ properly determined that Plaintiff had the residual functional capacity to perform light work.

Plaintiff emphasizes his functional capacities evaluation in January 2003, in support of his position. The FCE examiner opined that Plaintiff performed at the medium exertional level. He qualified that opinion, however, by stating that Plaintiff performed "at the lower level of this classification and with elevated complaints of pain and discomfort." For this reason, the examiner felt:

> [T]here is a question regarding his ability to perform at this level on an eight hour per day basis, 40 hours per week. Based on this, he was dropped ino a light PDC level as per the Dictionary of Occupational Titles, however, even at the light level he continues to require accommodation regarding activity such as sitting, standing, walking, etc.

(R. 422). The accommodations noted in the FCE report were: no repetitive bending, climbing, crouching, kneeling, or stooping; sitting and standing each limited to 20-30 minutes at a time with periodic adjustments for postural change as needed; and walking 20 minutes due to right leg pain. The examiner opined that with these accommodations, Plaintiff could function independently in the competitive labor market.

First, the undersigned notes the examiner based much of this opinion on Plaintiff's "elevated complaints of pain and discomfort," complaints which the ALJ found not entirely credible.

Second, the ALJ did determine Plaintiff had the RFC to perform only a limited range of light work, in accord with the FCE report (R. 23). He found he could sit for six hours and stand and walk for six hours only if permitted to briefly change positions at least every half hour. He could only occasionally climb, balance, stoop, kneel, crouch or crawl. The undersigned does not find these limitations inconsistent with those determined by the FCE examiner.

Third, the ALJ was not only entitled, but was required to consider the opinions of the State agency providers. 20 CFR §§ 404.1527(f)(2)(i) and 416.927(f)(2)(1) both provide:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists.

> However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The ALJ fully discussed the State agency physicians' opinions, and accorded them significant weight, although he did reduce Plaintiff's RFC from the medium level, as all the experts found, to the light level. Significantly, both State agency reviewing physicians opined Plaintiff could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday.

Finally, the ALJ's RFC is consistent with Plaintiff's own testimony, wherein he stated he could stand 30-45 minutes without moving around; could stand three hours if he could move around and adjust; and could sit about three hours before he would have to get up and move around.

The undersigned therefore finds substantial evidence supports the ALJ's RFC determination.

### E. Pain Analysis

Plaintiff next argues that the ALJ failed to properly apply the Social Security Regulations to analyze his pain caused by bulging and degenerative lumbar discs and his fatigue and lethargy caused by hepatitis C. Defendant contends the ALJ properly determined that Plaintiff's complaints were not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically

determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

The undersigned finds the ALJ fully complied with the first, threshold step in *Craig*, finding

the medical evidence showed Plaintiff had medically determinable impairments reasonably likely

to produce some of the symptoms he described. The ALJ was therefore required to go on to the

second step in *Craig*.

Contrary to Plaintiff's argument, the ALJ did not ignore the second-step factors and did not

base his credibility finding solely on the fact that Plaintiff did not use assistive devices and was not

hospitalized. A review of the ALJ's decision shows he considered all the second-step factors. He

discussed Plaintiff's statements about his pain and limitations; his medical history; the medical signs

and laboratory findings; the objective evidence of pain; Plaintiff's daily activities; and the medical

treatment he took to alleviate his symptoms. He did note particularly that Plaintiff did not use any

assistive device to stand or walk, that he had not been hospitalized except for his detoxification, and

33

that he was treated conservatively with only medication, exercise, and physical therapy. During much of the time, Plaintiff was not using any medication for pain, and was taking only Serzone for depression. On his Application, he listed Serzone and over-the-counter Ibuprofen as his only medications. Records show the Serzone helped, as did the pain medication when he was taking it.

Plaintiff may argue (as he stated on several occasions), that he was not taking pain medications due to his drug abuse history and/or his liver condition, yet he was prescribed Vicodin and Hydrocodone after his interferon treatment began, and after his hospitalization for alcohol and drug abuse (R. 119). In fact, his hepatitis specialist prescribed pain medications for him (R. 130).

The ALJ also discussed the medical evidence, including no neurological deficits and no problems standing or walking. Three different orthopedic specialists noted Plaintiff's reported pain was not consistent with the x-ray and CT evidence. In addition, there were only intermittent references to psoriasis, urinary frequency, and thyroid condition with no related functional limitations, and his hepatitis C was virtually asymptomatic up until Plaintiff started his Interferon treatment. Notably, Plaintiff reported liver disease for 30 years, but continued to drink alcohol excessively during that entire time.

The ALJ also noted Plaintiff reported a wide range of daily activities, including taking care of his young child, taking care of two dogs and a cat, and, on at least one occasion, taking three dogs and the four-year-old to the veterinarian's; caring for his personal needs without assistance; driving; attending church; running errands; shopping; taking out the trash; paying bills; reading; watching television; listening to music; attending AA meetings; walking; and participating in yoga. Just before he quit work and had himself admitted to Chestnut Ridge for alcohol dependence, drug abuse, depression and anxiety, he had attended Band Camp for at least four days, presumably as a chaperone for high school students (R. 217). He had just been to a big country music concert two

weeks earlier, and also went to see live acts at a local bar/concert hall. He testified that the frequency of his attendance at these events depended only on what acts were playing. In a third-party questionnaire, Plaintiff's wife stated that she and their two children depended on Plaintiff for care, and that he cooked, did laundry, paid bills, performed household repairs, ran errands, and shopped (R. 103).

The ALJ also discussed the fact that exercise and physical therapy were recommended as well as medication, but not rest or surgery, and that Plaintiff was generally only seeing a social worker for his mental impairments.

Significantly, Plaintiff related various reasons for quitting his job on August 31, 2001, his alleged onset date, and appears to have been less than candid with his treating and examining physicians regarding his drug and alcohol abuse. On his Disability application he wrote he quit when he was admitted to Chestnut Ridge Hospital for narcotic drug dependency and alcoholism. In fact, he even told his supervisors at work that he was abusing alcohol and needed to be off work to get treatment for that. At that time he said he was only "slightly depressed," and had "a little" nervousness and anxiousness. He was discharged from Chestnut Ridge with a diagnosis of alcohol dependence, "history of" cocaine dependence, and "history of" major depression. On November 5, 2001, however, Plaintiff told his treating physician he was being treated for severe depression. That medical doctor (who was not a psychologist or psychiatrist) then diagnosed severe depression. Plaintiff reported to State Disability Determination doctor Beard that his only hospitalization was for anxiety and depression. There is no mention of hospitalization for drug and alcohol abuse (R. 267). Plaintiff told orthopedist Dr. Lynch he quit his job on August 31, 2001 "because he couldn't tolerate the pain anymore." He testified at the hearing that he stopped work on August 31, 2001, because he "just couldn't do it anymore with the, the back problem and the other problems" [sic]

35

he was dealing with. On the other hand he told his therapist that he hated his job and had never been to it sober. On yet another occasion, he told a treating physician he drank alcohol only occasionally (R. 147), while two months later, he reported to his therapist that he drank three to six beers, four to five times a week, with an occasional shot of vodka (R. 240). He once described the "pros" of not returning to work as less back pain, less stress, more time with his kids and more time to relax.

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment are important in the evaluation of credibility, as is the consistency of the individual's own statements. See Social Security Ruling ("SSR") 96-7p. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). *Id.* The undersigned finds the inconsistencies in Plaintiff's statements regarding his medical history and the reasons for his quitting his job further support the ALJ's determination that Plaintiff was less than entirely credible.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984). The undersigned finds substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and other functional limitations.

## F. Favorable Evidence

Plaintiff finally argues it is reversible error for an ALJ to ignore favorable evidence. In particular, he argues the ALJ ignored Dr. Beard's findings that Plaintiff had increased dorsal

kyphosis[2] and a positive right Tinel's sign;[3] Dr. Rhodes' statement that numerous physical therapy modalities were attempted unsuccessfully and he only requested massage therapy as an adjunct treatment; and Dr. Berk's and Mr. Edmundson's reports referring to depression (citing R. 347, 348, and 349).       Regarding Dr. Beard's findings, mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. *See Gross v. Heckler*, 785 F.2d 1163 (4th Cir. 1986). Although Dr. Beard mentioned these findings, he did not opine that they caused any functional limitations. While he found Plaintiff had a positive Tinel's sign on the right wrist, he also found Plaintiff's wrists and hands had normal pulses and normal flexion and extension, there was no redness, warmth, swelling or nodules in either wrist, there was full range of motion of the fingers of both hands, and Plaintiff could make a fist, button and pick up coins with either hand, and write with his dominant hand without difficulty. Regarding the kyphosis, Dr. Beard found there was right paravertebral tenderness, but no spasm. There was pain with range of motion testing, but no pain or tenderness on percussion of the lumbar spine. Plaintiff could stand on one leg without difficulty and while he had positive straight leg raising supine, sitting straight leg raises were negative to 80 degrees on the right and 90 degrees on the left. Forward bending at the waist, extension and lateral motion of the spine was normal.

Regarding Dr. Rhodes' statement, the undersigned notes that the ALJ did discuss Dr. Rhodes' having prescribed "a vigorous walking program" in December 2001, and physical therapy in January, 2002. The ALJ also discussed medications prescribed for Plaintiff's various

---

[2]Increased convexity in the curvature of the spine. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 986 (30th ed. 2003).

[3]A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. *Id.* at 1703.

impairments.

Finally, regarding Dr. Berk's and Mr. Edmundson's reports, the ALJ did not ignore their references to depression. In fact he mentioned them expressly. *See* R. 18. The ALJ's treatment of Dr. Berk's report has already been discussed above. As to Mr. Edmundson's report, the undersigned first notes he is a Social Worker, not one of the "acceptable medical sources" who can provide evidence to establish an impairment. *See* §404.1513. He is, instead an "other source," from whom evidence *may* be used to show the severity of an impairment. *Id.* at (d). The ALJ therefore was not required to consider his opinion, although he did, in fact, consider it. Second, the ALJ fully discussed Plaintiff's depression, found it to be a "severe" impairment, and included limitations in his hypothetical to the Vocational Expert based on Plaintiff's alleged symptoms of depression.

The undersigned therefore finds the ALJ did not ignore favorable evidence.

For all the above reasons, the undersigned also finds that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled, as defined in the Social Security Act, at any time through the date of his decision.

## V. RECOMMENDATION

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff was not under a disability at any time through the date of his decision. I accordingly recommend Plaintiff's Motion for Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and this case be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __18__ day of May, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE